**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00722-JMC** |
| **RAFAEL RONDON, and**<br>**MARYANN MOONEY-RONDON** | |
| **Defendants.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Rafael Rondon to 51 months' incarceration (to run consecutive to Rondon's recently imposed 14-month sentence in *United States v. Rafael Rondon*, 21-cr-329 (FJS) (N.D.N.Y.)), three years of supervised release, $2,000 in restitution for damage to the U.S. Capitol, and a $100 special assessment for each count of conviction. The government requests that this Court sentence Maryann Mooney-Rondon to 46 months' incarceration, three years of supervised release, $2,000 in restitution for damage to the U.S. Capitol, $1,187.15 in restitution for a stolen laptop computer, $470.36 in restitution for two stolen CBRN escape hoods and satchel bags, and a $100 special assessment for each count of conviction. These recommendations are in the middle of the applicable Sentencing Guidelines ranges applicable to both defendants.

1

## INTRODUCTION

The defendants, Maryann Mooney-Rondon and Rafael Rondon, mother and son, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Rondon, a welding student, and Mooney-Rondon, the owner of a medical billing company, entered the U.S. Capitol Building through the breached Senate Wing Door at approximately 2:23 p.m., only 10 minutes after it was originally breached by other rioters. They traveled together to the Speaker of the House of Representatives' office suite, where they encouraged and assisted an unidentified male in stealing a laptop computer. Rondon later admitted that he helped the unidentified male disconnect cables from the laptop and put the device into a backpack. Mooney-Rondon later admitted that she assisted in the theft by providing the unidentified male with her gloves so he would not leave fingerprints on the laptop.

Rondon and Mooney-Rondon then traveled to the Senate Gallery overlooking the Senate Floor, where the Senators had recently been engaged in the election certification process before the riot caused them to recess. There, Rondon and Mooney-Rondon stole CBRN escape hoods,

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol Building and Grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation..

which are filtering respiratory protective devices maintained for the protection of Senators and Members of Congress and their staff from a chemical attack, as well as satchel bags for storage of those devices. Rondon and Mooney-Rondon donned the escape hoods and exited the Capitol Building, where they remained on the East Stairs with hundreds of other rioters.

When FBI agents later searched Rondon and Mooney-Rondon's residence, they discovered and seized several firearms, including an unregistered sawed-off shotgun. Rondon was later convicted and sentenced for possession of that firearm in the United States District Court for the Northern District of New York.

Rondon and Mooney-Rondon agreed to be interviewed by the FBI. When asked why he had not taken his car into the District of Columbia on January 6. Rondon replied, "I'm not taking my car into the city, which the Capitol Building I'm about to break into . . . Duh . . . Anybody who brought their car into D.C., and you planned on doing that [unlawfully entering the U.S. Capitol Building], you are a big fucking idiot." Mooney-Rondon admitted that she knew that Congress was in session and certifying the results of the 2020 election at the time she entered the Capitol Building.

The government recommends that the Court sentence Rondon to 51 months' incarceration, the middle of his advisory Guidelines' range of 46-57 months, which the government submits is the correct Guidelines calculation. The government recommends that the Court sentence Mooney-Rondon to 46 months' incarceration, at the middle her advisory Guidelines' range of 41-51 months, which the government submits is the correct Guidelines calculation. These sentences would reflect the gravity of Rondon and Mooney-Rondon's conduct, but also acknowledges their admission of guilt.

3

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, defendants Rondon and Mooney-Rondon among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the draft PSRs and the Statement of Offense incorporated into Rondon's plea agreement and Mooney-Rondon's stipulated facts at trial, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police

were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Rondon Statement of Offense, ECF No. 50 ¶¶ 1-7; Rondon Draft PSR, ECF No. 65 ¶¶ 14-19; Mooney-Rondon Statement of Facts for Stipulated Trial, ECF No. 57 ¶¶ 1-7.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol Building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10,

2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration

(May    19,    2021),    *available    at*    https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      The Defendants' Roles in the January 6, 2021 Attack on the Capitol**

*Approach and Entry of the Capitol*

On January 5, 2021, Rondon and Mooney-Rondon traveled by car from their home in Watertown, New York to Northern Virginia. On January 6, they took the Washington Metro into the Washington, D.C. to attend a political rally dubbed "Stop the Steal" in protest of Congress' certification of the Electoral College vote. After the rally, they marched with the crowd to the U.S. Capitol. Rondon wore a grey t-shirt, blue jeans, and brown shoes, and carried a red backpack.

Over the course of the day, Rondon wore two different red and black plaid jackets, as shown in Images 1 and 2.



*Images 1 and 2 (left to right) – Rondon inside the Capitol Building on January 6, wearing red plaid jackets*

Mooney-Rondon wore a long black winter coat, black denim jeans, black boots, and a patterned scarf, as shown in Image 3. Additionally, Mooney-Rondon wore two distinctive metallic rings on her right thumb and right ring finger, as shown in Image 4.



*Images 3 and 4 (left to right) – Mooney-Rondon inside Capitol Building on January 6,*
*wearing metallic rings (yellow circle)*

At approximately 2:13 p.m., as shown in Image 5, the Capitol Building was first breached by a rioter who jumped through a window adjacent to the Senate Wing Door, which had been broken by others.



*Image 5, still image from Exhibit 1, 2:13 p.m. – First rioter enters Capitol Building*

Less than one minute later, rioters who had entered through broken windows kicked open the Senate Wing Door from the inside. Many rioters who had massed outside the Senate Wing Door then entered the Capitol Building. *See* Image 6.



*Image 6, still image from Exhibit 1, 2:13 p.m. – Rioters kick open
Senate Wing Door*

At approximately 2:23 p.m., only ten minutes after the initial breach, Rondon and Mooney-Rondon entered the Capitol Building through the Senate Wing Door, as shown in Images 7 and 8.



*Image 7, still image from Exhibit 1, 2:23 p.m. – Rondon and Mooney-Rondon (left to right)
entering Capitol Building*



*Image 8 – Close up of Rondon and Mooney-Rondon (left to right)*
*entering Capitol Building*

Rondon and Mooney-Rondon proceeded together through the Crypt. At approximately 2:28 p.m., as shown in Image 9, they reached the Memorial Door, located on the east side of the Capitol Building, and then traveled up the Memorial Staircase to the second floor of the building.



*Image 9, still image from Exhibit 2, Timecode 12:07 – Rondon and Mooney-Rondon*
*(left to right) near the Memorial Door*

***Speaker of the House's Office Suite***

At approximately 2:32 p.m., Rondon and Mooney-Rondon entered the office suite of former Speaker of the House of Representatives Nancy Pelosi, as shown in Image 10.



*Image 10, still image from Exhibit 3, Timecode 12:34 – Rondon and Mooney-Rondon*
*(left to right) entering the Speaker's office suite*

Rondon and Mooney-Rondon entered the Speaker's conference room. There, Rondon sat on the conference table and Mooney-Rondon took his picture, as shown in Image 11.



*Image 11, still image from Exhibit 4, Timecode 00:03 –Rondon and Mooney-Rondon*
*(left to right) in the Speaker's conference room*

In the Speaker's conference room, Rondon and Mooney-Rondon encountered an unidentified male who was tampering with a laptop computer on the conference table, as shown in Image 12. Another rioter told the unidentified male, "You should take it." Mooney-Rondon agreed, "It would be interesting to know what's on that hard drive." Rondon added, "Yeah, just do it without, without no fingerprints, there." Another rioter yelled, "Take that fucking laptop!"



*Image 12, still image from Exhibit 4, Timecode 00:23 – Mooney-Rondon and Rondon (left to right in the yellow rectangle) encouraging unidentified male (red square) to steal laptop.*

Mooney-Rondon then provided her gloves to the unidentified male, so that he would not leave fingerprints on the laptop, as shown in Images 13 and 14. Rondon later admitted to FBI agents that he assisted the unidentified male by disconnecting cables from the laptop and shoving the laptop into the unidentified male's backpack.[2]

---

[2] Exhibits 4 and 5 are videos taken by other rioters. Rondon is not shown in either video assisting the unknown male in disconnecting cables from the laptop or shoving the laptop into the unidentified male's backpack.



*Images 13 and 14, still images from Exhibit 5 – Rondon (left) watching*
*Mooney-Rondon (right) provide her gloves to unidentified male (red).*

At approximately 2:34 p.m., Rondon and Mooney-Rondon left the Speaker's conference room. Rondon briefly interacted with the unidentified male who had stolen the laptop in the hallway before leaving that area with his mother.

Rondon and Mooney-Rondon travelled to several other rooms in the Speaker's office suite, where rioters were stealing, damaging, and destroying property, as shown in Image 15. At one point, Rondon stopped and rifled through a candy bowl, as shown in Image 16. Another rioter approached Rondon and asked, "What did I buy for these people?" Rondon answered, "Let's see." Rondon told the other rioter, "They don't have any caramel. That's the problem. They got no caramel." The other rioter replied, "They got no fucking taste!"

14



*Image 15, still image from Exhibit 6, Timecode 08:19 – Rondon (yellow) and Christian Secor (blue)[3] in Speaker's office suite*



*Image 16, still image from Exhibit 6, Timecode 08:47 – Rondon rifling through a candy bowl.*

Rondon and Mooney-Rondon then travelled together from the Speaker's office suite through the Rotunda to the Senate side of the Capitol Building, as shown in Image 17.

---

[3] As set forth in Section F, below, the facts in *United States v. Christian Secor,* 21-cr-0157-TNM, most closely align with those in this case. Hence, Secor is also identified in certain images in this memorandum.



*Image 17 – Mooney-Rondon and Rondon (left to right)
in the Rotunda*

### *Senate Gallery*

At approximately 2:40 p.m., Rondon and Mooney-Rondon walked up the Senate Gallery

Stairs to the third floor of the building, as shown in Image 18.



*Image 18, still image from Exhibit 7, Timecode 00:18 – Rondon and Mooney-Rondon
(yellow, left to right) and Secor (blue) ascending the Senate Gallery Stairs*

16

At approximately 2:42 p.m., Rondon and Mooney-Rondon arrived at the Senate Gallery foyer and explored the area. *See* Image 19.



*Image 19, still image from Exhibit 8, Timecode 02:29 – Rondon and Mooney-Rondon (left to right) in the Senate Gallery corridors*

Rondon and Mooney-Rondon entered the Senate Gallery at approximately 2:43 p.m., as shown in Image 20.



*Image 20, still image from Exhibit 9, Timecode 02:29 – Mooney-Rondon and Rondon (left to right) entering the Senate Gallery*

They sat down in the Senate Gallery, overlooking the Senate Floor, as shown in Images 21 and 22. Approximately one-half hour earlier, Vice President Mike Pence had presided over Senate deliberations on the certification of the 2020 Electoral College vote.



*Image 21 – Mooney-Rondon and Rondon (yellow, left to right) and Secor (blue) in the Senate Gallery*



*Image 22 – Close up of Mooney-Rondon and Rondon (left to right) in the Senate Gallery*

Near the Senate Gallery, Rondon and Mooney-Rondon stole CBRN escape hoods, which are respiratory filtration devices maintained by the U.S. Capitol for use by Members of Congress and staff. They also stole black satchel bags with orange straps that contained the escape hoods. At approximately 2:47 p.m., Rondon and Mooney-Rondon exited the Senate Gallery carrying the escape hoods with satchel bags, as shown in Image 23. In the Senate Gallery foyer, they stopped, opened the bags, and donned escape hoods, as shown in Image 24.



*Image 23, still image from Exhibit 10, Timecode 02:17 – Rondon and Mooney-Rondon (left to right) exiting the Senate Gallery wearing satchel bags containing escape hoods*



*Image 24, still image from Exhibit 10, Timecode 04:16 – Rondon and Mooney-Rondon (left to right) donning escape hoods and wearing satchel bags*

19

Less than 10 minutes prior, many Members of Congress and staff on the other side of the Capitol Building donned the same CBRN escape hoods while sheltering in place in the House of Representatives. *See* Image 25.



*Image 25 – Members of Congress sheltering in place in the House Gallery, wearing escape hoods[4]*

### *Exit from the Capitol to East Central Stairs*

Rondon and Mooney-Rondon returned to the second floor, exited the Capitol Building at the Rotunda Doors at approximately 2:53 p.m., and did not re-enter the building. Rondon and Mooney-Rondon were inside the Capitol Building for approximately 30 minutes. When they exited, both were still wearing stolen escape hoods, as shown in Image 26.

---

[4] Drew Angerer, Getty Images, *available at* https://www.npr.org/2022/01/05/1069977469/a-timeline-of-how-the-jan-6-attack-unfolded-including-who-said-what-and-when (last visited August 24, 2023).



*Image 26 – Mooney-Rondon and Rondon (left to right) exiting Capitol
and wearing escape hoods*

Rondon and Mooney-Rondon traveled from the Rotunda Doors to the East Central Stairs.

As shown in Images 27 and 28, Rondon was still wearing the stolen escape hood on his head, and

Rondon and Mooney-Rondon were each holding stolen satchel bags.



*Image 27 –Rondon and Mooney-Rondon (left to right)
on the East Central Stairs*

21



*Image 28 – Close up of Rondon and Mooney-Rondon (left to right)*
*on the East Central Stairs*

Subsequently, Rondon and Mooney-Rondon departed the Capitol Grounds. As shown in

Image 29, Mooney-Rondon was still wearing a stolen satchel bag across her body.



*Image 29 – Mooney-Rondon and Rondon (left to right)*
*departing the Capitol Grounds*

22

*Search of the Defendants' Residence*

On June 29, 2021, agents executed a search warrant on the Watertown residence shared by Rondon, Mooney-Rondon, and her husband. Agents located the two stolen satchel bags for the escape hoods, as shown below in Images 29 and 30, as well as clothing matching that worn by the defendants on January 6.



*Image 29 – Escape hood satchel located in the Defendants' residence.*



*Image 30 – Second escape hood satchel located in the Defendants' residence.*

In Rondon's room, agents found a hastily disassembled AR-15 style rifle. Agents believe Rondon spotted the FBI team approaching the house from his second-story window and attempted to disassemble the firearm. Agents also found a loose shotgun barrel that had appeared to have been sawed off of a shotgun. Agents confronted Rondon about where the rest of the firearm was located. Rondon was initially reluctant to discuss that subject but ultimately directed the agents to a separate family property where he had concealed two pistols and a homemade sawed-off shotgun in shrink wrap, wrapped in towels, and buried underneath the floorboards of an outbuilding. Rondon was subsequently charged, convicted, and sentenced for possession of an unregistered sawed-off shotgun in the Northern District of New York.[5]

### Rondon's FBI Interview

Rondon and Mooney-Rondon both consented to be separately interviewed by FBI agents, which agents audio recorded. Agents asked Rondon to describe his overall impressions from January 6. He stated, "For me personally . . . It felt amazing. Because, for the first time in a whole year and some odd months, I was gathered with people, and people weren't . . . looking at you weird because you didn't have a mask on . . . It was almost like things were normal again for a couple hours . . . It's probably, unfortunately, never going to be that way again . . . It felt like old times. It was relieving . . . Everyone was so nice." Rondon explained that he and Mooney-Rondon

---

[5] On December 16, 2022, Rondon plead guilty in the Northern District of New York to Possessing an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, and admitted to the forfeiture allegation. On July 11, 2023, Senior Judge Frederick J. Scullin, Jr. sentenced Rondon to 14 months imprisonment followed by a term of supervised release of 3 years. Judge Scullin ordered Rondon to self-surrender to an institution designated by the Bureau of Prisons by September 19, 2023. *See Rondon*, 21-cr-329 (N.D.N.Y.), ECF No. 74.

traveled to D.C. to attend the "Stop to Steal" rally. Rondon wanted to see former President Trump speak, whom Rondon called "one of the greatest comedians."

Rondon advised that prior to entering the Capitol Building, he observed a broken window in the exterior of the Capitol Building. He also saw rioters yelling at U.S. Capitol Police (USCP) officers, and he smelled tear gas in the air. Rondon claimed he got "shuffled in with the rest of 'em" through the Senate Wing Door after others had breached that entrance.

Rondon admitted to entering the Speaker of the House of Representatives' office suite. He recalled thinking it was "kind of funny" when he saw former Speaker Nancy Pelosi's name on a sign. Agents asked what he observed there. Rondon explained that he was primarily located in the Speaker's conference room, where he saw a laptop computer. Rondon admitted to assisting an unidentified male steal the laptop computer. Rondon stated, "While we were in the office, [the unidentified male], he was trying to rip the ethernet cords to one of the laptops, and he yelled at me and my mother to help him . . . I assisted him a little bit, and that was probably stupid of me." When asked by investigators how he otherwise assisted in the theft, Rondon admitted that he "pushed [the laptop computer] in [the unidentified male's] bag a little bit, using a glove, 'cause [the unidentified male] didn't want to get his fingerprints on it."

Rondon stated that after leaving the Speaker's office suite, he recalled, "going through the Rotunda" where "Capitol Police [were] blocking off one entrance." Rondon told agents that he encountered a USCP officer who told Rondon to leave the Capitol Building. Rondon claimed that he told the officer, "I'm on my way out." However, Rondon explained that instead of following the officer's order to leave, he "ended up" in the Senate Gallery. There, Rondon saw other rioters "standing and laughing, and shooting the shit, and sharing remarks." Rondon stated, "I think I

watched one kid who was making a cell phone call from the Speaker's chair. That was pretty funny." Rondon told FBI agents that he wished he had taken video of the rioter on the Senate dais because "that shit was fucking hilarious."

Rondon admitted to stealing the escape hoods and satchel bags, which he said had been stacked outside of the Senate Gallery. Agents explained to Rondon that the escape hoods were for Members of Congress and their staff. Rondon asked why there were so many escape hoods on the Gallery level, since Members of Congress and staff probably had their own escape hoods on the Senate Floor. An agent explained that in addition Members of Congress and staff, on certain days and with proper pre-clearance, members of the public could tour the Gallery. Rondon remarked, "That's what I was on – a tour," and laughed. Rondon explained that he donned the escape hood "just in case . . . I did end up running into a wall of smoke. I didn't want to be the one gasping for air and spitting out on the ground."

Agents asked whether Rondon drove his car into D.C. on January 6. Rondon answered, "No," and confirmed that he and Mooney-Rondon took the Washington Metro into and out of the District. An agent conducting the interview commented, "You guys are fancy . . . Most people don't take the Metro." Rondon replied, "Because I'm not taking my car into the city, which Capitol Building I'm about to break into . . . Duh." Rondon remarked that rioters who did not take the Metro into D.C. on January 6 were "dumbasses." Rondon continued, "Anyone who brought their car to D.C., and you planned on doing that [unlawfully entering the U.S. Capitol Building], you are a big fucking idiot . . . There is cameras riddled throughout D.C."

*Mooney-Rondon's FBI Interview*

Mooney-Rondon told agents that she travelled to Washington, D.C., to attend the "Stop the Steal" rally. Agents asked her whether she was aware of any other events that were scheduled in D.C. on January 6. She admitted that prior to her entry she was aware Congress was engaged in the certification of the election inside the Capitol Building.

Mooney-Rondon informed agents that she and Rondon listened to speeches at the rally, including the entirety of former President Trump's speech, and then "walked out with the crowd . . . [and] followed this whole crowd down towards the Capitol." Mooney-Rondon described the scene at the Capitol as "chaotic" when she arrived. She stated, "By the time we got there, there were people hanging from the building, and they had scaffolding up, and they were scaling the scaffolding, and I was just like, 'Oh wow! Wow!'" Mooney-Rondon stated that she saw rioters pushing against a group of police officers' shields as she approached the Capitol, and she smelled tear gas in the air. Despite witnessing such violent events, Mooney-Rondon advanced towards the building. Mooney-Rondon remarked, "I have no idea what we were thinking." She expressed regret and characterized her actions as "a very bad lapse of judgement."

Agents asked Mooney-Rondon what she was thinking when she entered the Capitol Building through the breached Senate Wing Door. She replied, "Holy cow!" Agents pressed Mooney-Rondon, asking whether her observations up to that point had caused her to pause and think about going into the building. She replied, "You know, I've thought about this . . . a little bit. I'm a very—generally—measured, calculated person. I think things through. How the heck that happened, I really don't have a clue . . . Next thing you know, we're in the Capitol. I'm not going to lie."

Mooney-Rondon then falsely claimed that a police officer had held the door open for her to enter the Capitol Building. As shown in Exhibit 1, there were no police officers present when Mooney-Rondon and Rondon entered through the breached the Senate Wing Door. Agents showed Mooney-Rondon a still image of her entry and agents challenged her claim that a police officer had held the door open. Mooney-Rondon equivocated and stated that it may have been another occasion when she saw a police officer holding a door open and not during her entry.

Mooney-Rondon admitted to entering the Speaker's office suite. She knew the offices belonged to former Speaker of the House Nancy Pelosi because she "saw the sign above the door." Mooney-Rondon described taking a picture of Rondon sitting on top of the Speaker's conference table. Mooney-Rondon admitted to assisting the unidentified male in the theft of the laptop computer. She told agents she provided the unidentified male with either her gloves or her scarf. Agents asked why the unidentified male would have wanted Mooney-Rondon's gloves or scarf, and she replied, "Probably so he wouldn't leave fingerprints." Mooney-Rondon told agents, "I obviously knew [the unidentified male] shouldn't be messing with [the Speaker's] computer." However, as shown in Exhibit 4, Mooney-Rondon actually encouraged the unidentified male to steal the computer, telling him, "It would be interesting to know what's on that hard drive." Also, during her interview, Mooney-Rondon recalled cautioning the unidentified male not to remove "cables" from the laptop computer because she feared doing so would "ruin everything," or result in a loss of data.

After leaving the Speaker's conference room, Mooney-Rondon observed a rioter breaking glass in the Speaker's office suite and other rioters looking through the contents of an office desk.

Nevertheless, she and Rondon stayed inside the building and traveled further into the Capitol to the Rotunda.

Mooney-Rondon admitted to entering the Senate Gallery. She described taking a picture of herself and Rondon. She remarked, "Obviously, we should not have been there." She then downplayed her and others' activities, stating, "It was literally utter chaos . . . It was almost like we all were just a bunch of tourists. [Laughs] Sorry." She informed agents that after observing rioters jump from the Gallery level to the Senate Floor, she and Rondon decided to leave.

Mooney-Rondon admitted to stealing escape hoods and satchel bags: "When we went out of the chamber, there was a guy . . . he had found these big black duffle bags in the hall and he was pulling out gas masks to the left and to the right . . . I know that [Rondon] and I each had a gas mask at some point." Mooney-Rondon admitted to discarding the escape hoods as she and Rondon left Capitol grounds. She admitted keeping the satchel bags and bringing them home with her.

At the end of the interview, Mooney-Rondon downplayed her role in the attack on the Capitol: "I didn't take anything, unless you count the gas masks. I didn't break in, so to speak, we walked in . . . Obviously, we should not have gone in, but we didn't really do a whole lot." She also expressed regret and told agents that she would take back her actions if she could.

### *Rondon's Social Media Activity*

Rondon was active on Instagram. On March 14, 2021, Rondon exchanged direct messages over Instagram with "IG Contact" regarding his participation in the riot on January 6. IG Contact sent a picture of Rondon inside the Capitol Building on January 6 and asked, "Yo is this you??? Ive been wondering." Rondon replied, "You got that right lmaooo." IG Contact asked, "No way

really??? Dude I saw this like a month ago and I was so curious lol." Rondon remarked, "If you saw it that long ago I'm not too worried . . . Thanks for the heads up tho . . . And the feds can kiss my left . . . Nut*." IG Contact replied, "Love that!!! Fuck the feds."

### *Property Loss*

The United States has been unable to locate the laptop computer that was stolen from the Speaker's conference room by an unidentified male with the assistance of Rondon and Mooney-Rondon. The laptop computer was purchased in August 2020 for $1,187.15. Additionally, the United States has been unable to locate the escape hoods that Rondon and Mooney-Rondon stole. The satchel bags agents recovered from the defendants' home are useless without the escape hoods. The stolen escape hoods and bags together caused a total loss of $470.36.

## II.    THE CHARGES AND PLEA AGREEMENT

On December 8, 2021, a federal grand jury returned a nine-count indictment charging Rafael Rondon and Maryann Mooney-Rondon with:

- Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2 (Count One);

- Theft of Government Property (Escape Hoods with Satchels), in violation of 18 U.S.C. § 641 (Count Two);

- Theft of Government Property (Laptop Computer), and aiding and abetting, in violation of 18 U.S.C. §§ 641, 2 (Count Three);

- Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(1) (Count Four);

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Five);

- Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count Six);

- Entering and Remaining in the Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C) (Count Seven);

- Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), (Count Eight); and

- Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), (Count Nine).

On December 5, 2022, Rondon pled guilty to Count One, Obstruction of an Official Proceeding and Aiding and Abetting.

On March 27, 2023, the Court held a stipulated bench trial for Mooney-Rondon on Count One, Obstruction of an Official Proceeding and Aiding and Abetting, and on Count Three, Theft of Government Property (Laptop Computer) and Aiding and Abetting, in violation of 18 U.S.C. §§ 641 and 2. The Court convicted Mooney-Rondon on both charges.

### III.   STATUTORY PENALTIES

#### A.  Rondon's Penalties

Rondon now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. As noted by the plea agreement and the U.S. Probation Office, Rondon faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

#### B.  Mooney-Rondon's Penalties

Mooney-Rondon now faces the same sentence for her conviction of the obstruction count. For her conviction on Count Three, Theft of Government Property (Laptop Computer) and Aiding and Abetting, in violation of 18 U.S.C. §§ 641 and 2, she faces up to one year of imprisonment, a fine up to $100,000, and a term of supervised release of up to one year.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Rondon's Guidelines Calculation

The government disputes the Sentencing Guidelines calculation set forth in the Rondon's Draft PSR because the U.S. Probation Office did not include a special offense characteristic for causing or threatening to cause property damage in order to obstruct the administration of justice under U.S.S.G. § 2J1.2(b)(1)(B). *See* Rondon Draft PSR ¶¶ 35-45. The government submits that Rondon's correct offense level includes the special offense characteristic under U.S.S.G. § 2J1.2(b)(1)(B) and should be calculated as follows:

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[6] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[7] | +3 |
| | **Total** | **25** |

---

[6] As further detailed below in subsection C, the special offense characteristic under U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense "involved causing or threatening to cause . . . property damage, in order to obstruct the administration of justice." Theft is tantamount to destruction when stolen items are never recovered. In the plea agreement, Rondon reserves the right to contest the application of the enhancement. *See* Plea Agreement, ECF No. 49 at ¶ 4(A).

[7] The parties agree that U.S.S.G. § 2J1.2(b)(2) applies. The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Rondon admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officers from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters on January 6.

| **Combined Offense Level** | **25** |
|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **22** |

*See* Rondon Plea Agreement, ECF No. 49 at ¶ 5(A) and (C).

In the plea agreement, the parties stipulated to an offense level of at least 17 before acceptance of responsibility and agreed that Rondon could contest the application of the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B). *See id.* Rondon's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the above calculation but permits Rondon to argue that the enhancement in U.S.S.G. 2J1.2(b)(1)(B) does not apply because his offense did not involve causing or threatening to cause property damage in order to obstruct the administration of justice. *See* Plea Agreement, ECF No. 49 at ¶ 5(A) and (C).

The Probation Office correctly calculated Rondon's criminal history score as 3 points and category as II, which incorporates Rondon's recent sentence in the Northern District of New York for possession of an unregistered firearm. Rondon Draft PSR ¶ 48. Accordingly, based on the government's calculation of Rondon's total adjusted offense level, after acceptance of responsibility, at 22, Rondon's Guidelines range is 46 to 57 months of imprisonment.

### B. Mooney-Rondon's Guidelines Calculation

As with Rondon, the government disputes the Sentencing Guidelines calculation set forth in the Mooney-Rondon's Draft PSR because the U.S. Probation Office also did not include a special offense characteristic for causing or threatening to cause property damage in order to obstruct the administration of justice under U.S.S.G. § 2J1.2(b)(1)(B). *See* Mooney-Rondon Draft PSR ¶¶ 31-45. The government submits that Mooney-Rondon's correct offense level includes the special offense characteristic under U.S.S.G. § 2J1.2(b)(1)(B) and should be calculated as follows:

<u>Count One: 18 U.S.C. §§ 1512(c)(2), 2</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | <u>+3</u> |
| | **Total** | **25** |

<u>Count Three: 18 U.S.C. §§ 641, 2</u>

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 3A1.2(a) | Official victim | <u>+3</u> |
| | **Total** | **9** |

U.S.S.G. § 3D1.1(a)(1):
Group 1 is Count 1 (18 U.S.C. §§ 1512(c), 2).
Group 2 is Count 2 (18 U.S.C. §§ 641, 2).

U.S.S.G. § 3D1.1(a)(2) & 3D1.3:
Offense levels applicable for each group: Group 1: 25; Group 2: 9.
Highest offense level: 25

U.S.S.G. § 3D1.1(a)(3):
Total units: 1 unit, increase of 0. Breakdown: Group 1: 1 unit; Group 2: 0 units

| | |
|---|---|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **22** |

The Probation Office correctly calculated Mooney-Rondon's criminal history score as zero and category as I. Mooney-Rondon Draft PSR ¶ 48. Accordingly, based on the government's calculation of Rondon's total adjusted offense level, after acceptance of responsibility, at 22, Mooney-Rondon's Guidelines range is 41 to 51 months of imprisonment.

**C. The Court Should Apply the Eight-Level Enhancement for Causing or Threatening Injury or Property Damage to Obstruct the Administration of Justice, and the Three-Level Enhancement for Substantial Interference With the Administration of Justice.**

The Court should apply Section 2J1.2(b)(1)(B)'s eight-level enhancement for causing or threatening to cause injury or property damage in order to obstruct the administration of justice. *See* U.S.S.G. § 2J1.2(b)(1)(B). Rondon and Mooney Rondon's theft of escape hoods and satchels, and their aiding and abetting the theft of the laptop computer, plainly qualifies their offenses of conviction as offenses "involv[ing] causing or threatening to cause . . . property damage[ ]in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). Second, the defendants' conduct obstructed the "administration of justice," *id.*, because the certification of the Electoral College vote falls within that phrase's scope. Rondon and Mooney-Rondon have stipulated that their conduct obstructed that certification. *See* Rondon Statement of Offense, ECF No. 50 at ¶ 18; Mooney-Rondon Statement of Facts for Stipulated Trial, ECF No. 57 at ¶ 21.

This Court should apply Section 2J1.2's three-level enhancement for "substantial interference with the administration of justice," for the same reasons. U.S.S.G. § 2J1.2(b)(2). Rondon has agreed that the enhancement applies in his plea agreement. Rondon Plea Agreement, ECF No. 49 at ¶ 5(A). Mooney-Rondon stipulated that her actions interfered with the election certification on January 6, 2021. Mooney-Rondon Statement of Facts for Stipulated Trial, ECF No. 57 at ¶ 21. The government anticipates that Mooney-Rondon may object to the interpretive question: whether the certification of the Electoral College vote qualifies as the "administration of

justice." It does apply, as every judge in this district who has considered the question, save two,[8] have concluded, both to the eight-level and three-level enhancements in Section 2J1.2.

### *Causing or Threatening to Cause Property Damage*

Section 2J1.2(b)(1)(B) of the Guidelines applies because the Defendants' offense involved "causing or threatening to cause . . . property damage in order to obstruct the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding," as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," see 18 U.S.C. § 1515(a)(1)(B), specifically, Congress' Joint Session to certify the Electoral College vote.

Under U.S.S.G. § 1B1.3, relevant conduct for sentencing encompasses both the defendants' own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. U.S.S.G. § 1B1.3(a)(3). Rondon and Mooney-Rondon object to the application of this enhancement; however, it applies here for at least two reasons.

*First*, because Rondon stole property, the injury/property enhancement applies based upon his own acts under Section 1B1.3(a)(1)(A)'s definition of "relevant conduct" in the guidelines. *See*

---

[8] Judge McFadden has declined to apply sentencing enhancements under the above U.S.S.G. sections regarding the administration of justice and has issued opinions in his decisions, as further detailed below. *See United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, Doc. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022). In *United States v. William Watson*, 21-cr-0513, Judge Walton has also declined to apply the enhancements but did not issue a written opinion on his decision.

U.S.S.G. § 1B1.3(a)(1)(A). Mooney-Rondon stipulated to facts that she aided and abetted the theft of government property, to wit: a laptop computer. "[D]amage" in Section 2J1.2(b)(1)(B) can be interpreted to include loss of usefulness. *See* American Heritage Dictionary of the English Language (5th ed. 2020) ("Destruction or a loss in value, usefulness, or ability resulting from an action or event."); Oxford English Dictionary (2021) ("Injury, harm; esp. physical injury to a thing, such as impairs its value or usefulness."). These definitions support a reading of "property damage" that includes theft because, when property is stolen, the owner is harmed in his use and enjoyment of the property. Moreover, theft of property that is not recovered interferes with the owner's use of the property at least as much as physical damage to or destruction of property.

Here, Rondon and Mooney-Rondon admitted to FBI agents that they stole emergency escape hoods and satchel bags reserved for use by Members of Congress and staff during an emergency where chemicals or smoke is present. In fact, on January 6, many Members of Congress and staff used the same style escape hoods while sheltering in place in the House of Representatives. The escape hoods were never recovered by investigators. The satchels that held the escape hoods, which Rondon and Mooney-Rondon kept as trophies from January 6, were recovered when agents searched their shared residence. However, the satchel bags are useless without the escape hoods that they are designed to carry and should be considered as part of a total loss. Thus, Rondon and Mooney-Rondon's theft of the escape hoods and satchel bags, at least, makes this offense one that involves property damage.

*Second*, U.S.S.G. § 1B1.3(a) (1)(A) encompasses both the defendants' own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. Rondon and Mooney-Rondon joined a crowd of other rioters who

were stealing, destroying, or damaging property within the Speaker's office suite. When Rondon was in the Speaker's conference room, he "assisted an unidentified male in the theft of a laptop located on the Conference Room table." ECF No. 50, at 4. Rondon encouraged the unidentified male to steal the laptop without leaving behind fingerprint evidence of the crime. *See* Exhibit 4, Timecode 00:23. Then, Rondon "assisted in the theft by disconnecting cables from the laptop and placing the laptop into a bag belonging to the unknown male." ECF No. 50, at 4. As detailed in the Statement of Facts for the stipulated bench trial, Mooney-Rondon encouraged the unidentified male to steal the laptop without leaving behind fingerprint evidence of the crime. *See* ECF No. 57, at 6, *see also* Exhibit 4, Timecode 00:23. The identified male then took the laptop computer." ECF No. 57, at 7. Rondon and Mooney-Rondon made their way further into the Speaker's office suite, where they joined other rioters who were engaged in property destruction and looting in the office suite. Other rioters around Rondon and Mooney-Rondon caused significant damage to the Speaker's office suite and several pieces of office equipment, furniture, fixtures, and decorations were broken. By joining a crowd of rioters inside the Speaker's office suite, and by assisting an unidentified male to steal a laptop computer, Rondon and Mooney-Rondon strongly encouraged, and aided and abetted those rioters immediately around him who were damaging property.

Additionally, under the Guidelines commentary, the enhancement is "designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation." U.S.S.G. § 2J1.2, Application Note 5. Rondon and Mooney-Rondon's conduct falls squarely within what is covered by that application note.

The Defendants' theft of escape hoods and satchels, and their aiding and abetting an unidentified male who stole a laptop computer from the Speaker's office suite, was in service of

"intimidation or retaliation." Rondon and Mooney-Rondon's video recorded statements to the unidentified male suggest that they wanted him to steal the laptop to exploit any data that might be located on the device. This is clear example of theft for purposes of intimidation and retaliation. With regards to the escape hoods, Rondon explained to FBI agents that they stole and donned the escape hoods in case they encountered smoke or gas. Neither of the Defendants, however, has explained why they kept the satchel bags as trophies.

This was not a crime of poverty, driven by a need to sell stolen goods, or to trade them for drugs. Unlike the example provided in the guidelines commentary, the Defendants' did not steal these items, or aid and abet the unidentified male in theft of the laptop, because they were incriminating evidence of a different crime. U.S.S.G. § 2J1.2, Application Note 5 (referring to "destroying a ledger containing an incriminating entry"). To the contrary, the satchel bags were taken by the Defendants and saved as a memento rather than be destroyed.

Rondon and Mooney-Rondon have stipulated to their purpose that day: to obstruct the certification of the vote. Rondon Statement of Offense, ECF No. 50 at ¶ 18; Mooney-Rondon Statement of Facts for Stipulated Trial, ECF No. 57 at ¶ 21. That purpose is also plain from their conduct and the context. Given that purpose, it follows that the Defendants' intended to affect, delay, or influence that certification through intimidation. No reasonable person could view theft of property and participating in the looting of the Speaker's office suite and the Senate Gallery as merely an attempt to gently persuade or reason with (rather than intimidate) Congress. The Defendants and other rioters like them stole items belonging to Members of Congress and staff, sat on tabletops as Rondon did, put their feet up on U.S. Senators' desks, stole or destroyed symbolic items throughout the Capitol, and shuffled through official documents, scattering them

on the floor. Much like a school bully perusing through a victim's locker or lunchbox, the only plausible purpose of that kind of conduct is to send a message to Members of Congress and staff in the building: that the rioters, not Members of Congress or their staff, were in control. That message of intimidation was sent to force Congress to delay the certification, to try to influence Congress to change its vote, or at a minimum to punish (i.e., retaliate against) Congress should it go through with the certification. It is difficult to conceive of any other purpose beyond intimidation or retaliation that this riotous conduct could have served.

A contrary view would lead to absurd results. An analogous case would be a defendant who showed up at a key government witness's house, on the morning of the witness's anticipated trial testimony, with a mob; waltzed in after the mob broke into the house, causing the witness to flee and lock themselves in a bedroom; helped another burglar steal the witness's laptop computer, rifled through the witness's candy bowl, told others to find purported evidence in the house, and stole the witness's expensive gas mask; and left after having prevented the witness from leaving on time to testify. Every court would conclude that that conduct was "caused or threatened as a means of intimidation or retaliation" under Section 2J1.2. This case is no different, except that it was Members of Congress and their staff who were hiding in locked rooms and prevented from executing the "administration of justice."

### *Substantial Interference with the Administration of Justice*

According to the commentary to U.S.S.G. § 2J1.2(b)(2), the term "substantial interference with the administration of justice" include "the unnecessary expenditure of substantial governmental or court resources." See U.S.S.G. § 2J1.2(b)(2), Application Note 1. For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding," as

defined in 18 U.S.C. § 1515(a)(1). In the Capitol Riot cases, the term "official proceeding" refers to a "proceeding before the Congress, § 1515(a)(1)(B).

The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. Rondon and Mooney-Rondon corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

This adjustment is particularly appropriate for Rondon and Mooney-Rondon, who entered the Capitol and assisted an unidentified male in the theft of a laptop computer in the Speaker's conference room while, at that time, Members of Congress were sheltering in place in the House. From there, Rondon and Mooney-Rondon entered the Senate Gallery, where less than one-half hour prior Vice President Pence had presided over Senate deliberations on the certification of the 2020 Electoral College vote.

### Guidelines Definition of "Administration of Justice"

The Court should apply both the three-point enhancement for substantially interfering with the administration of justice, under U.S.S.G. § 2J1.2(b)(2), and the eight-point enhancement for causing or threatening to cause property damage in order to obstruct the administration of justice, under U.S.S.G. § 2J1.2(b)(1)(B), over defendant's objection. The Defendants' conduct obstructed the "administration of justice," as that term is used in the Guidelines, because it obstructed certification of the Electoral College vote.

### i. The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under eleven other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts

required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. § 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements

43

under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That is good reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious conduct in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more

serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker*, No. 1:21-cr-00193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.").

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(C) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2. On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a

premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two

different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.[9] See U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18. Application of both subsections (b)(1)(B) and (b)(2) is therefore appropriate here.

> ### ii. Courts, including judges on this Court in January 6 cases, have correctly held that non-judicial proceedings can involve the administration of justice.

Other courts have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial

---

[9] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification. *United States v. Rubenacker*, No. 1:21-cr-00193 (BAH), Sentencing Hearing Tr. at 69. She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker, Sentencing Tr.* at 75. This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

Several judges on this Court have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Wilson*, No. 1:21-cr-00345 (Lamberth, J.); *United States v. Hodgkins*, No. 1:21-cr-00188 (Moss, J.); *United States v. Fairlamb*, No. 1:21-cr-00120 (Lamberth, J.); *United States v. Chansley*, No. 1:21-cr-00003, (Lamberth, J.); *United States v. Matthew Miller*, No. 1:21-cr-00075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 1:21-cr-00193 (BAH) (contested); *United States v. Guy Reffitt*, No. 1:21-cr-00032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 1:21-cr-00023 (Kelly, J.); *United States v. Robertson,* 1:21-cr-00034 (Cooper, J.) (contested).

### iii. Judge McFadden's contrary conclusion in *Seefried* and *Secor* is unpersuasive.

One judge on this Court, Judge McFadden, has reached a contrary conclusion, concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations." *United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, Doc. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24,

2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022). Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, Doc. 123 at 4. He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at 5. But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally. Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." *Seefried*, Doc. 123 at 11-13. But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the

49

prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary. *Seefried*, Doc. 123 at 14-17. As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at 403. The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson. Id.* at 404. Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, Doc. 123 at 15. Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes

congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court' superfluous." *Seefried*, Doc. 123 at 17. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.  And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous. This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. *Seefried*, Doc. 123 at 16. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit

significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, Doc. 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17. Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, Doc. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of

justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, Doc. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors

throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

In sum, Congress's certification of the Electoral College vote constitutes the "administration of justice" for purposes of these two guidelines provisions.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rondon and Mooney-Rondon's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Rondon and Mooney-Rondon's offenses were of the utmost seriousness, and fully support the

government's recommended sentence for Rafael Rondon to 51 months' incarceration, three years of supervised release, $2,000 in restitution for damage to the U.S. Capitol, and a $100 special assessment for each count of conviction, and for Maryann Mooney-Rondon to 46 months' incarceration, three years of supervised release, $2,000 in restitution for damage to the U.S. Capitol, $1,187.15 in restitution for a stolen laptop computer, $470.36 in restitution for two stolen CBRN escape hoods and satchel bags, and a $100 special assessment for each count of conviction.

### B.  The History and Characteristics of the Defendants

Rondon is a 25-year-old high school graduate from Watertown, New York. Rondon Draft PSR ¶ 67. Rondon was recently enrolled in a welding certification program in Florida while on pre-trial release, but it is not known whether he completed the program. *Id.* Other than his firearms conviction in the Northern District of New York, Rondon does not have any other prior arrests or criminal convictions. *Id.* at ¶¶ 47-48.

Mooney-Rondon is a 57-year-old retired fiscal coordinator from Watertown, New York. Mooney-Rondon Draft PSR ¶ 69. She does not have any other prior arrests or criminal convictions. *Id.* at ¶ 48.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rondon and Mooney-Rondon's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.       The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a lengthy term of incarceration.

Unlike some other January 6 defendants, Rondon and Mooney-Rondon have accepted responsibility for their actions. However, their extensive unlawful conduct inside the Capitol Building, including their assistance of a theft of a laptop computer from the Speaker's Office, their occupation of the Senate Gallery—both places where only a small minority of rioters entered on January 6—and their theft of the escape hoods and satchel bags, coupled with their minimizing and partially self-serving statements to the FBI, make their actions on January 6 far more culpable than those of the large majority of rioters who entered and demonstrated inside the building. Such wanton conduct warrants significant prison sentences and long terms of supervised release to specifically deter these defendants from future unlawful conduct triggered by election outcomes that they do not like.

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

56

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although the other defendant discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

*United States v. Christian Secor,* 21-cr-0157-TNM, is factually the closet case to this case. On May 19, 2022, Secor pled guilty to Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2. Secor entered the Senate Wing door of the Capitol Building at approximately 2:26 p.m., about three minutes after Rondon and Mooney-Rondon.  Secor, Rondon, and Mooney-Rondon took the same route upon entry, walking through the Crypt to the second floor of the building, and then to the Speaker's office suite. Secor and Rondon are shown above in Image 15, parading together through the Speaker's office suite. The government does not have information that Secor encouraged or assisted others in the theft of

---

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

property while in the Speaker's office suite. Rondon and Mooney-Rondon aided and abetted the theft of a laptop computer.

Secor, Rondon, and Mooney-Rondon then traveled to the Rotunda. Their paths diverged when Secor travelled to the Rotunda doors. There, Secor helped a group of rioters push open the Rotunda Doors, trapping three officers in the process. As shown in Images 18 and 21, and Exhibit 10, Secor, Rondon, and Mooney-Rondon were reunited in the Senate Gallery, entering at the same approximate time. Unlike these defendants, the government does not have information that Secor stole anything while in the Senate Gallery.

Mooney-Rondon, and Secor's paths diverged again. Secor departed the Senate Gallery and travelled to the Senate Floor, where he sat in then Vice President Mike Pence's chair. Rondon and Mooney-Rondon exited the building using the East Stairs. Both Rondon and Secor made social media references to January 6 after the fact, though Secor's post-January 6 statements were more prolific and egregious. Unlike Secor, Rondon and Mooney-Rondon kept the stolen satchel bags as souvenirs from the riot.

The government and Probation calculated Secor's Guidelines range by including sentencing enhancements under U.S.S.G. § 2J1.2(b)(1)(B), Threat or Physical Injury to Person or Property, and U.S.S.G. § 2J1.2(b)(2), Resulted in Substantial Interference, as with the Defendants in the instant case. Additionally, the government and Probation included a sentencing enhancement under U.S.S.G. § 3C1.1, Obstruction of Justice, since Secor destroyed evidence. Accordingly, the government and Probation Office calculated Secor's total adjusted offense level, after acceptance of responsibility, at 24. Secor's Guidelines range was 51 to 63 months' of imprisonment. Judge McFadden sentenced Secor to 42 months' imprisonment on the § 1512(c)(2) count.

### G.    Rondon's Sentence Should Run Consecutive to NDNY Sentence

The Court's sentence for Rondon should run consecutive to the 14-month sentence imposed *Rondon*, 21-cr-329 (N.D.N.Y.) for possession of an unlicensed sawed-off shotgun. Under 18 U.S.C. § 3584(a), "If . . . a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt… Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."

In *Rondon*¸ 21-cr-329 (N.D.N.Y.), Judge Scullin, Jr., expressly did not account for Rondon's January 6 conduct when imposing a sentence. Likewise, none of the conduct at issue in Rondon's case in the Northern District of New York has been treated as "relevant conduct" in arriving at the Guidelines range for the January 6 case. Because Rondon's unlawful possession of the unlicensed sawed-off shotgun on June 29, 2021 was not relevant conduct to the offenses for which he is being sentenced in this case, and because the requirements of U.S.S.G. Section 5G1.3(a), (b), and (c) are not satisfied, this Court can, and should, order that the sentence in this case be served consecutively to the sentence in the NDNY case, pursuant to U.S.S.G. Section 5G1.3(d). *See United States v. Adam Honeycutt*, D.D.C. 22-cr-50 (CJN) (ordering that the sentence for the January 6 offenses be served consecutively to the sentence previously opposed for defendant's unlawful possession of firearms and drug paraphernalia seized during execution of search warrant in the January 6 case).

The seriousness of the conduct in both Rondon's January 6 case and the firearms case in the Northern District of New York weighs in favor of consecutive sentences. *See* 18 U.S.C.

§ 3553(a)(1) (requiring the sentencing court to consider the "nature and circumstances of the offense"); 18 U.S.C. § 3553(a)(2)(A) (requiring the court to consider the "seriousness of the offense"). Additionally, Section 3553(a) factors militate in favor of a consecutive sentence in this matter, including "to promote respect for the law, and to provide just punishment for the offense" under 18 U.S.C. § 3553(a)(2)(A) and "to afford adequate deterrence for criminal conduct" under 18 U.S.C. § 3553(a)(2)(B).

## VI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

Here, Rondon agreed to the payment of $2,000 in restitution in his guilty plea. This Court should enforce that agreement, as virtually every judge in this District has done when a January 6 defendant has agreed to pay restitution as part of a guilty plea.

Mooney-Rondon did not plead guilty and the government is not bound by a plea agreement to request a particular amount of restitution. The government requests that this Court order Mooney-Rondon to pay the $2,000 restitution that virtually every January 6 defendant convicted of a felony has been required to pay, plus the amount of loss that Mooney-Rondon personally caused by her offense conduct. That includes the $1,187.15 replacement cost for the theft of the laptop she encouraged and aided and abetted, and $470.36 for the stolen gas masks.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Rondon to 51 months' incarceration, to run consecutive to the sentence imposed by the Northern District of New York, three years of supervised release, $2,000 in restitution, and a $100 special assessment for each count of conviction.

Likewise, the government recommends that the Court sentence Mooney-Rondon to 46 months' incarceration, three years of supervised release, $2,000 in restitution for damage to the Capitol, $1,187.15 in restitution for the laptop, $470.36 in restitution for the escape hoods and satchel bags. and a $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney
DC Bar No. 481052


By:    s/ Will N. Widman
        WILL N. WIDMAN
        NC Bar No. 48158
        Trial Attorney, Detailee
        1301 New York Avenue NW, 8th Floor
        Washington, DC 20530
        (202) 353-8611
        Will.Widman@usdoj.gov