UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 1-21-cr-722 -2 (JMC) |
| | : | |
| MARYANN MOONEY-RONDON | : | |
| | : | |
| _____ | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Maryann Mooney-Rondon, through undersigned counsel, submits this sentencing memorandum to aid the Court at sentencing. Following a stipulated trial, Ms Mooney-Rondon was found guilty of count 1, 18 U.S.C. §§1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting, and count 3, 18 U.S.C. §§641, 2, Theft of Government Property (laptop), Aiding and Abetting. Based on the facts and arguments below, Ms Mooney-Rondon requests the Court sentence her to six-months of home detention on each count running concurrently, followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We submit that this sentence would most accurately address the concerns of the sentencing statute, 18 U.S.C. §3553.

As is our practice, we are not going to belabor the Court with a recitation of the information contained in the Presentence Report. Rather we will contain our remarks to factors we feel pertinent and relevant to the Court's sentencing calculus outside of that document, focusing on Ms Mooney-Rondon's actions and memories of the events of 6 January 2021, and perspective on her position over two years later.

**Prologue to 6th January.**

Maryann Mooney-Rondon was a supporter of former President Trump. She'd believed in him back in 2016 and felt as re-election loomed he'd earned her vote again for another term in office. The events of the latter part of 2020 took a very strange undertone though. In the period leading up to the election, perhaps reading the political tea-leaves, the former president claimed were he to lose the election, this could only happen if election fraud were to take place. This meme was bombarded across right-wing media.

A sad indictment of our times is media outlets have become increasingly polarized and seek not to *inform* their respective audiences, rather cater to the already-apparent biases of their target demographic. In response, it is natural for the audience, hearing what they want to hear, to become increasingly fervent having their particular suspicions and fears buttressed. No one likes to lose, and reassuring any crowd that *if we lose its because we were cheated* is an incredibly powerful narcotic, and this message struck a resonant chord with the right-wing faithful. As the first Tuesday in November approached, the message of potential voter-fraud to the devoted increased to frenetic levels: The scene was set for discord. Trump constantly stoked the fires claiming there was an organized effort from his adversaries to "steal" the election. This was nuclearized with the message that the conservative vote as a whole was being neutralized. Again, the message resonated. Moreover. in addition to the media, the circles and friends one encounters also has a strengthening factor to personal beliefs or fears. All this combined, and on the eve of the election the stage was set; the powder was primed.

3rd November arrived. The country watched with bated breath as America went to the polls. Tuesday evening turned into Wednesday; the nation perched on the edge of its seat as the election leaned towards Biden. The right-wing media went into overdrive. It didn't help that recount after recount left us 4 days without a decision, but by Saturday the result was called. The effect of this four-day delay only served to ramp-up the tensions and fears as the faithful watched what appeared

to be Trump's prediction coming to pass. In the wake of the result, an explosion of frenzy followed with court cases, recounts, protests of cheating screamed from the rooftops. The new meme of "Stop the Steal" took over the airwaves. As court case after court case collapsed, as recount after recount confirmed the returns, and as state after state refused to nullify their results, the options for the faithful dwindled. 6th January 2021 was the scheduled date for Congress to exercise its two-hundred-year-old constitutional duty in certifying the votes of the Electoral College, and this date quickly became the new focal point. Trump called for a huge rally for that day, and the MAGA hats responded.

### 6th January, 2022

As the day approached, Maryann Mooney-Rondon considered the situation. She had observed the last eight weeks frenzy and outrage from the outlets. She had discussed the events with her close friends, relatives, and contemporaries. As mentioned, over the course of his presidency Maryann had viewed him to be a good man and a president worthy of a return to office. She was aware of the upcoming rally and discussed attending with friends and relatives—specifically her husband and two children. While the discussion was tinged with sadness as the family were disappointed with the election loss, they had no real inkling that there was anything to be done with respect to the result. Rather this was viewed as a last opportunity to see and hear the outgoing president. So, literally at the last minute, upon searching frantically for a hotel, Maryann and her son, Rafael, decided to make the trip.

Mother and son arrived in the DC area on the evening of the 5th. Subsequent to some research to familiarize themselves with the area, and Metro, and following dinner, they turned in to get some rest for the following day.

The next morning, Maryann and Rafael made their way downtown to the Ellipse. It took some time to arrive at the rally, and by the time they got there the immediate area on the Ellipse

itself was full. They found a place on the hill surrounding the Washington monument and watched the proceedings on the nearest jumbotron. Maryann remembers the tone of the crowd in her immediate area as somewhat split: A feeling of camaraderie with fellow Trump supporters tinged with sadness again at the election loss. Some were crying. In wrapping up the rally, Trump implored the faithful to go to the Capitol to get their voices heard. Maryann and Rafael, along with their immediate crowd began the trek down Constitution Avenue.

As they joined the scene at the Capitol, the crowd had reached critical masse. People were packed together like sardines. Maryann was afraid. She was in a strange town with the only person she knew right in front of her. She was afraid of getting separated. She realized her phone had no service. If she lost Rafael she had no idea how she would ever find him in this mêlée. As the crowd pushed forward, she held on to his backpack as tight as she could. She remembers everything being a blur. One minute they were outside on the terrace, the next she was inside. To his day, she is uncertain how that happened.

Before moving on, Maryann Mooney-Rondon would like to be clear about this idea of being carried along. She had not fostered any preconceived intent to enter the Capitol that day. However, the nature of the situation was not one that encouraged thoughtful reflection. Additionally, the actions of the police at that entry point did not seem to be taking any active steps to prevent entry. This claim of the police letting rioters in building that day has been spread by many. On being exposed to significant materials in these matters, this has always troubled counsel knowing the efforts of the police on that day, and how these two conflicting versions can coexist in the same universe. In a different January 6 trial, counsel heard the testimony of officers who were stationed at an entry point. The sergeant testified that there was only himself and four other officers. The numbers of protesters streaming in made it physically impossible to prevent entry. He was not going to order his men to do anything that endangered them physically. So, they stood

to the side and limited their actions to attempting to verbally encourage peaceful respect for the building. This is borne-out by video footage. Nonetheless, it is clear how the protesters misread lack of police action in certain places and how to some extent there still exists the feeling amongst the Trump faithful that they were let in. The upshot of this for Maryann is despite the events of the day constituting a breach of security, her the time and place of her entry was free of the violence seen in other areas. She was swept in while clinging to her son for dear life. So, as people went into the building, she went along. She recognizes and accepts responsibility for these decisions, but remains of the belief that there was no criminal intent on her part, nor of anyone around her to discern.

Now in the building, Maryann was confused and lost. Everywhere looked the same and when taken in context with the circular nature of the Rotunda it was very easy to get turned-around and lose one's bearings. After wandering around, up and down hallways, she found herself in an office that that turned out to belong to the Speaker of the House. There were numerous people in that room, but she specifically recalls two individuals: one doing something with a laptop, and another attempting to break the glass on some kind of cabinet. She remembers the man with the laptop yell at her to give him her gloves. She recalls being afraid and handed them to him. She remembers thinking matters were getting out of hand and it was time to leave. She and her son attempted to find an exit. In doing so they found themselves on the Senate side. It was clear there was conflict in that area and no sign of an exit. They backtracked and eventually found their way out of the building. As they were on the way out, they encountered an individual who was wearing what appeared to be some kind of uniform—a black polo shirt and black pants. He was not dressed like a rioter but to this day Maryann does not know who he was. He had a black tote-type bag and was handing out the escape hoods. As there was pepper spray in the air, Maryann took one of the hoods she was handed. Once outside they decided enough was enough and made their way back

PeterCooperLaw

to the hotel. That night they stayed in their hotel room. As they watched the reports coming in, they became aware of what had transpired at other locations in and around the building, and hearing reports of what had taken place, the gravity of what had transpired set in, and the feeling that things would never be the same again was inescapable.

**The Present Day.**

Maryann Mooney-Rondon looks back at the events of 6th January 2021 with regret. She feels regret from several angles. First, she expresses remorse for her actions that day. In going to the Capitol, she had no intent to engage in any of the behavior that rose to the level we all experienced. The environment she found herself in was animated to say the least and she found herself being swept along, both emotionally in the mentality of the mob and physically in the manner in which she found herself in the Capitol building itself. As we have mentioned, that is not to say that she was forced in against her will but rather the frenzy left little time for self-reflection: the self-reflection she now employs. She looks back and understands the gravity of being inside the building; what it meant. It brings home that this went way beyond her initial intent. It is the trigger of why she felt the need to get out as quick as she could. She wishes she'd encountered that epiphany before things got out of hand. She knows that despite a lack of any underlying malevolence, or any preconceived plan to alter the election, or even to *fight like hell*, her actions crossed a line, and she accepts responsibility for this.

Secondly, she feels sadness at the manner that the day is now perceived. She came to DC with the honorable intent of displaying her support for the outgoing president and hearing him speak one last time. Throughout the Capitol building area, events span out of control. The nature of the violence the nation witnessed has cast a pall over anyone who attended that day, and that is something she will take a long time to get over. She believes the events of that day will inevitably come back to haunt the ex-president, and that certainly is contradictory to the main reason she

6

travelled to DC. She has been approached on several occasions by media to provide her side of events, but has declined to do so. Quite simply her experiences on that day have left an indelible sour taste in her mouth and she wants to put it in the past and close the door as quickly as possible. She is very frightened or what could happen to her at sentencing but she wishes to make the Court aware that she knows she's here based on her own actions and takes responsibility.

**Sentencing Factors.**

18 U.S.C. §3553 provides:

**(a) Factors To Be Considered in Imposing a Sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>   **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>   **(2)** the need for the sentence imposed—
>>      **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>      **(B)** to afford adequate deterrence to criminal conduct;
>>      **(C)** to protect the public from further crimes of the defendant; and
>>      **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Addressing these factors individually we find the following. Nature and circumstances of the offense with respect to this offense is a highly combustible issue, and we will return to it later. On history and characteristics of the defendant there is not much debate. Maryann Mooney-Rondon has no criminal history; indeed this is her first encounter with the criminal justice system. Her background displays an individual who has not only led a completely law-abiding existence prior to the events bringing her here, but one portraying a wife and mother of two grown children who runs her own business. Subsection (2)(A) discusses seriousness of the offense, respect for the law, and just punishment for the offense. We will return to this also when we discuss nature and circumstances of the offense. Subsection (B) contemplates adequate deterrence to criminal

7

conduct. She has been emotionally shaken by these experiences with the justice system, and the insight she has acquired has left her with the strongest of convictions that this will be her last. Incarceration is not necessary to make that point. Subsection (C) considers a similar idea as that in (B), in protecting the community from further criminal contact. Here we point out Ms Mooney-Rondon is *literally* as far from being a career offender as is possible and, again, given her experiences here, the public has nothing to fear from Maryann Mooney-Rondon in the future. As a final comment on Subsections (B) and (C), the events of January 6 constitute Ms Mooney-Rondon's first and only foray into mass political events. She has been scarred by this and has vowed to stay as far away from such happenings as possible. With respect to her views on the ex-president, Ms Mooney-Rondon doubts his suitability for further office. Regarding Subsection (D), quite simply Ms Mooney-Rondon has no need of any of the services available to U.S. Probation. Which brings us back to sections (1) and (2)(A).

Returning to the nature and circumstances of the offense we find in these matters this is a not a simple issue to unpack. On the one hand, the specific conduct and decisions Maryann accepts responsibility for, in the universe of criminal conduct, are not the most egregious considered by these courts. However, taken into context with the much larger events of 6 January, the nature and circumstances question becomes much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditionary behavior has in some cases been charged and convicted. But we ask the Court to take note that Ms Mooney-Rondon is one of a small group of people who despite having gone down the regrettable road of entering the Capitol realized it was not the place to linger and got out as quickly as possible. We ask the Court to recognize that even at what appeared to be the point of no return, this was a Rubicon she determined to back away from. We ask the Court to view her actions against the backdrop of those with more sinister intentions as proof of her original harmless purpose and sentence her accordingly.

PeterCooperLaw

Addressing (2)(A), we have already discussed Ms Mooney-Rondon's view of the rioters' actions being contrary to the best interests of the country, but she also views those acts as not being true to one of her core values of respect towards law and order. We highlight to the Court that she has never been associated with any organisation encouraging civil disobedience, advocated overthrow of the government, displaying extremist right-wing views, or has encouraged in any way violence of the nature apparent on 6th January. In terms of any sense of danger to the community, there is simply non: it does not exist. The Court should have no concerns as to her views on the respect for law either today or for the future.

The final issue §3553 to be discussed is the last part of (2)(A): just punishment for the offense. At its heart, this is the very central issue for this Memorandum as a whole. Ms Mooney-Rondon is a law-abiding citizen, who placed herself in the wrong place at the wrong time. She came to DC to attend a political rally, and quickly found herself in the middle of an escalating situation in which speech, free or not, was being dropped as a form of expression by a mob, spinning out of control, where rage was taking over. She has been shattered at the fallout from that day. Her life will never be the same again. This, in and of itself, is more than adequate punishment. In no way, shape or form should the Court be under the impression that a departure sentence would be seen as getting away with anything. For the rest of her life Maryann will forever be associated with the events of that day, and she takes this to heart.   Given all discussed above, including the fact of his decision to disengage when he did, we ask the Court to sentence in accordance with our proposal.

**Sentencing Enhancements**.

The government seeks an eight (8) level enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B), which calls for such where: "[T]heir aiding and abetting the theft of laptop computer, plainly qualifies their offenses of conviction as offenses "involv[ing] causing or

9

threatening to cause . . . property damage[ ]in order to obstruct the administration of justice." However, the relevant commentary on § 2J1.2 states: "The inclusion of 'property damage' under subsection (b)(1)(B) is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (e.g., to intimidate a witness from, or retaliate against a witness for, testifying)." Ms Mooney-Rondon is not alleged to have injured anyone or engaged in violence on January 6, 2021. *See Stinson v. United States*, 508 U.S. 36, 44-45 (1993) (Supreme Court holding that commentary should, "be treated as an agency's interpretation of its own legislative rule."). *See also id.* at 38 (Supreme Court holding that commentary which, "interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.")

A plain reading of the commentary reveals the inapplicability of this section to Ms Mooney-Rondon. Were the Court to adopt the government's interpretation, any defendant convicted of § 1512(c)(2) would automatically qualify for the eight (8) level enhancement and be subjected to an effective base offense level of twenty-two (22), with a minimum recommended imprisonment of 41-51 months. Again, this Court should not indulge the government's attempt to shoehorn these statutory offenses into Guidelines with significant enhancements the Sentencing Commission never contemplated applying to the events of January 6, 2021. Thus, the only conduct for which Ms Mooney-Rondon should be held responsible is the conduct for which the Court found her responsible and not for the thousands of rioters who convened on January 6, 2021.

With respect to Ms Mooney-Rondon's conduct, a plain reading of the Guideline confirms that its intent is not to apply to, "threatening to cause physical injury to [*any*] person." Rather, the Guideline is clearly intended to apply only to those persons who serve also as participants in the administration of justice, such as witnesses or judicial officers. As the commentary to § 2J1.2

PeterCooperLaw

10

makes clear, reference to "property damage" was added to subsection (b)(1)(B) to include cases where, for example, a witness's property is destroyed, or threatened to be destroyed, for the purpose of intimidation. Consider, for example, the 1991 Amendment to the Guideline which, "clarifies the types of circumstances to which §§ 2J1.2(b)(1) and 2J1.2(c)(1) apply" and for which each of the amendments clearly apply to participants in the proceeding. The government has not and does not allege that neither Ms Mooney-Rondon nor her son had a plan to stop the certification of the electoral college, let alone threaten its participants.

Finally, even were the Court to conclude that the offenses for which Ms Mooney-Rondon was convicted, "involved . . . threatening to cause property damage . . . in order to obstruct the administration of justice," because the certification of the electoral college vote is not "the administration of justice," this enhancement may not be applied. The "administration of justice" is in fact a legal term of art, so much so that it is defined within Black's Law Dictionary: "The maintenance of right within a political community by means of the physical force of the state" and "the state's application of the sanction of force to the rule of right." A*dministration of Justice*, Black's Law Dictionary (11th ed. 2019), quoted in *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, at *5 (D.D.C. Oct. 29, 2022). Similarly, "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Id.* Therefore, a plain reading of § 2J1.2(b)(1)(B) suggests that the enhancement applies only where the obstruction of a judicial or quasi-judicial tribunal has occurred.[1]

---

[1] The District of Columbia Court of Appeals has interpreted "due administration of justice" to primarily (if not exclusively) be used, "to describe the proper functioning and integrity of a court or hearing." *Wynn v. United States*, 48 A.3d 181, 191 (D.C. 2012).

11

As the Court is aware, this was the conclusion reached by Judge McFadden in this District when the issue was similarly presented at sentencing. *See Seefried*, 2022 U.S. Dist. LEXIS 196980, at *31-32

> "If the Sentencing Commission had foreseen the Capitol breach, it may well have included 'official proceeding' in the text of § 2J1.2. But the Commission did not. Given that the Court should interpret the Guidelines using traditional tools of statutory interpretation, this Court declines to rewrite § 2J1.2 to say what it does not. If the Commission wishes to expand the text of the Guideline to include official proceedings such as the electoral certification, 'it may seek to amend the language of the guidelines by submitting the change for congressional review.'" (quoting *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018).

In its memorandum, in addressing Judge McFadden's analysis, the government argues that merely because a definition does not include an event, does not mean it is excluded. However, concerning the definitions within the commentary of § 2J1.2 relating to "administration of justice," as the government points out, we encounter "investigations, verdicts, and judicial determinations." The government goes on to discuss interfering with a felony investigation and cites this as not being enumerated. But, if we look to the stark meaning of obstruction of justice, or perverting the administration of justice by another name, Black's Law Dictionary defines it as, "The skewing of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge." Black's Law Dictionary (11th ed. 2019). Despite not being listed, interference with a felony investigation clearly points towards skewing of *legal proceedings*, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge, whilst the application requested by the government plainly does not. (emphasis added). To drive home the point, the Background to § 2J1.2 provides:

> This section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a

> juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.

In sum, Congress went to great lengths to include what it believed to be pertinent. The government's interpretation is not included, and we ask the Court to view this as Judge McFadden has and take the position that it would be improper to add language to a statute that Congress did not.

Regarding the three (3) level enhancement pursuant to § 2J1.2(b)(2) this does not apply insofar as the certification of the electoral college is not a proceeding the interference of which constitutes the interference with the administration of justice.

With respect to 18 U.S.C. §§641, 2, the government also requests an enhancement pursuant to U.S.S.G.§3A1.2(a), Official victim. Quite simply, this does not apply as there is no evidence in the record that the laptop in question was the property of an official victim. The fact that it was in the office of the Speaker of the House sheds no light on the identity of its owner and assumes a fact not in evidence. We would suggest that any "official" machine would enjoy much greater security than sitting atop a desk in the open.

**Need to avoid sentencing disparities.**

A word on sentencing disparities. In similar matters, the government has created a sentencing chart for individuals that have been convicted and sentenced in relation to the events of January 6. While it is true that the longest sentence for a defendant whose most serious offense was 18 U.S.C. 1512(c)(2) is 90 months, courts have already sentenced a defendant convicted of §

13

1512(c)(2) as low as 6 months' home detention; 60 months' probation. *See United States v. Crowl* No. 21-cr-28. The essential problem here is the spectrum to which these defendant's belong is vast and by nature, disparate. In these cases it is entirely appropriate to sentence one participant to over eight years in prison while effectively placing another on probation. We ask the Court not to sentence Ms Mooney-Rondon based on the circumstances of others, but to focus on the participants here and sentence accordingly.

**Conclusion**

Taking all the above into account. We ask the Court to provide the following sentence. We submit a 6-month period of home detention on each count, followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We believe the community would benefit far more from her service than her incarceration. We believe this sentence to best satisfy the concerns of 18 U.S.C. §3553.

/s/ *Peter A. Cooper*
_____
Peter Cooper; 478-082
Counsel for Maryann Mooney-Rondon
400 5th Street NW.
Washington DC 20001